SIMON TROPP et al., Plaintiffs, *v.* KNICKERBOCKER VILLAGE, INC., et al., Defendants.

Supreme Court, Special Term, New York County, March 24, 1953.

*William L. Messing* for plaintiffs.

*Nathaniel L. Goldstein, Attorney-General (Philip Watson* of counsel), for Herman T. Stichman, as Commissioner of Housing of the State of New York, defendant.

*Kenneth C. Newman, Harry Loeb Mostow, Joseph A. Weinberger* and *Stanley P. Seigel* for Knickerbocker Village, Inc., defendant.

*Abraham Pruzan* for Brooklyn Garden Apartments, Inc., defendant.

MATTHEW M. LEVY, J. This is an action for a declaratory judgment brought by two tenants, one a resident of the housing project of the defendant Knickerbocker Village, Inc., and the

other a resident of the project of the defendant Brooklyn Garden Apartments, Inc. The complaint consists of two causes of action, one on behalf of each plaintiff as against his respective landlord and against the defendant Stichman, as Commissioner of Housing of the State of New York. The defendant landlords are limited-dividend housing corporations organized pursuant to the State Housing Law (now the Public Housing Law). The defendant Knickerbocker's housing project was constructed in 1934, and the plaintiff Tropp became a resident there in 1941; the project of the defendant Brooklyn was constructed in 1929, and the plaintiff Deyo became a resident there in 1942.

The Public Housing Law upon its enactment in 1939, limited occupancy in this type of residential project to those tenants whose income, generally speaking, was not in excess of a specified ratio to the rent prescribed for the particular apartment involved (Public Housing Law, § 182, subd. 3); and, in the event the tenant's income exceeded the allowed ratio, he was obligated to vacate the premises (§ 156, subd. 4). On April 4, 1951, an amendment, among others, was enacted, by which clause (3) of paragraph (a) of subdivision 3 of section 182 of the Public Housing Law, provided in effect that a tenant whose income exceeds the statutory ratio—but not beyond a certain point—might nevertheless be permitted by the housing company to remain in possession of his apartment, where the company is convinced that eviction of the tenant would result in undue hardship to him or that other appropriate housing accommodations are unobtainable; but, in such event, the tenant would be charged a rental increased in proportion to his ability to pay, as determined by the housing company, with the approval of the commissioner. Pursuant to this statute the commissioner promulgated a schedule of rent increases, graduated in accordance with fixed categories of excesses in allowable incomes of various classifications of tenants and applicable to tenants whose incomes exceed the statutory ratio.

The present income of each of the plaintiffs concededly exceeds that ratio (but is within the limit of the permissible excess), and each was notified by his respective landlord that the rent to be paid by him was to be in the scheduled increased amount. Both tenants refused to pay the additional sums, not upon the ground that their income increases did not make them factually subject to the rent increases within the terms of the schedule, but because of their contentions (as presented in this action) that clause (3) of paragraph (a) of subdivision 3 of section 182 of the Public Housing Law, is violative of the Fed-

eral and State Constitutions; that the subdivision is inapplicable to them; and that the new rent schedule is in excess of the defendants' statutory authority and unlawful. The plaintiffs urge that the statutory provision was passed after these housing developments had been constructed and after these plaintiffs had been in possession; that it impairs the obligation of contract; that it deprives them of property without due process of law; that it constitutes an unlawful delegation of authority; and that the acts of the defendants in fixing the rent increases were arbitrary and capricious.

The plaintiffs in their complaint pray for a judgment declaring the statutory enactment unconstitutional and inapplicable, the administrative schedule unlawful and ineffective, and the landlords' demands improper. Each of the defendants in this action has appeared and answered. The defendant commissioner's answer consists of technical denials together with a defense alleging, in effect, the same material facts as are set forth in the complaint, and his answer demands affirmative judgment of a declaration of constitutionality of the statute and validity of the scheduled increases. The answer of the defendant Brooklyn is similar. That of the defendant Knickerbocker in effect (although not in language) raises the same issues. The defendant commissioner moved for judgment on the pleadings pursuant to section 476 of the Civil Practice Act and rule 112 of the Rules of Civil Practice. The plaintiffs, as well as the defendant Brooklyn, cross-moved for judgment on the pleadings under the same section and rule. The defendant Knickerbocker similarly moved for judgment on the pleadings under the same provisions and for a dismissal of the complaint pursuant to rule 212 of the Rules of Civil Practice, and for other relief not now significant.

Where, as here, all of the parties in the action have appeared and answered, and, with the pleadings in complete form, each has made similar motions on the basis of those pleadings, they thus concede that there exists no question of fact, and that the issues presented to the court for decision are solely questions of law. Where, as is the case here, the material facts are admitted, and only questions of law are to be determined, a motion for judgment on the pleadings under section 476 of the Civil Practice Act and rule 112 of the Rules of Civil Practice is properly made and may be entertained by the court in the exercise of its discretion (*Bogart* v. *County of Westchester*, 270 App. Div. 274, motion for leave to appeal denied, 295 N. Y. 934, appeal dismissed, 296 N. Y. 701).

The contention is presented by one or more of the defendants that the plaintiffs' remedy is not by means of a declaratory-judgment action but rather that of an article 78 proceeding. I do not agree, at least with respect to the principal phases of the relief requested. While resort to the use of a declaratory judgment is usually unnecessary when an adequate and complete remedy is already provided by another form of action, no prohibition upon its use has been stated in the statute or attempted to be placed by the decisions. The court may, of course, exercise its discretion and refuse to proceed to a declaratory judgment when other remedies are available and adequate. But the Appellate Courts have never gone so far as to hold that, when there exists a genuine controversy requiring a judicial determination, the Supreme Court is bound — solely because another remedy is available — to refuse to exercise the power conferred by section 473 of the Civil Practice Act and rule 212 of the Rules of Civil Practice, with reference to the remedy of declaratory judgment (*Woollard* v. *Schaffer Stores Co.*, 272 N. Y. 304). This remedy, moreover, is particularly appropriate where a constitutional question is involved, or the legality or meaning of a statute is in question, and where there is no issue of fact (*German Masonic Temple Assn. of City of N. Y.* v. *City of New York*, 279 N. Y. 452; *Dun & Bradstreet* v. *City of New York*, 276 N. Y. 198). That is precisely the situation in the case at bar. I hold, therefore, that a declaratory judgment under the facts here presented is the appropriate procedural vehicle. Accordingly, I shall proceed to a consideration of the merits of the several motions. That requires first a résumé of the history of the applicable legislation and regulations, in the light of the constitutional provisions.

The first State Housing Law (L. 1926, ch. 823, § 2, as amd.) was enacted not alone to eradicate slum areas but also to provide low-rent housing accommodations for low-income tenants. It did not contain any income-rental ratio provisions. As amended in 1928, it authorized the State Board of Housing to " make, amend and repeal rules and regulations " to effectuate the purposes of the law (§ 15, subd. 6; L. 1928, ch. 722, § 2). In 1936, it was established by regulation of the board that limited-dividend housing corporations must, in renting their accommodations, grant preference to prospective tenants with low incomes. That regulation reads as follows: " Section 31. Low Income Preference. In passing upon applications the Corporation shall grant preference to families of low income and to families with children. The Corporation

shall limit approval to families in which the maximum annual household income is not in excess of approximately five times the annual rental. On renewal of existing leases the Corporation shall review the incomes of applicant families."

The 1939 legislation (now termed the Public Housing Law) established the first statutory income-rental ratios as a guide to the State Superintendent of Housing (subsequently the commissioner) in carrying out the duties of his office, by restricting income to five or six times the annual rental, as the specific case may be. The applicable section was in the following language: " The dwellings in a housing company project hereafter constructed shall be available for persons or families whose probable aggregate annual income at the time of admission does not exceed five times the rental (including the value or cost to them of heat, light, water, and cooking fuel) of the dwellings to be furnished such persons or families, except that in the case of families with three or more dependents such ratio shall not exceed six to one. The ' probable aggregate annual income ' means the annual income of the chief wage earner of the family plus all other income of other adult members of the family, plus a proportion of income of gainfully employed minors, the proportion to be determined by the superintendent. The superintendent may approve or disapprove a lease or a renewal thereof, to a prospective tenant, and may compel a housing company to accept a tenant whose application for a lease or a renewal thereof is approved by the superintendent." (§ 182, subd. 3.)

Thereafter, and in 1951, subdivision 3 of section 182, was amended — so far as pertinent here — by giving subdivision 3 a new designation (subd. 3, par. [a], cl. [1]), and by adding clauses (2), (3) and (4) to that subdivision. So far as relevant to the present issues, there was no substantial change in clause (1) and it sets forth the maximum income that can be earned by an applicant at the time of admission to an apartment in the limited-dividend housing project. Clause (2) authorizes the commissioner to approve or disapprove an application for a lease in accordance with the prescribed income limits. Clause (4) provides for the eviction of tenants whose incomes exceed by more than 25% the limitation set forth in clause (1). And clause (3) of paragraph (a) of subdivision 3, as amended in 1951, reads in full as follows: " In the event that the income of the family residing in a project increases and the ratio to the rental of the dwelling becomes greater than prescribed in this paragraph, and the income is not more than twenty-five per centum above the family income so prescribed for admis-

sion to the dwelling and such increased income continues for a period of three months or more, the housing company may permit the tenant to continue to occupy his dwelling provided the housing company is convinced that the tenant cannot secure other safe and sanitary dwelling accommodations, or by reason of other facts the removal of the family from the project would occasion other undue hardship to the family. However, the rent of such family shall be increased in proportion to its ability to pay more, the amount of increase to be ruled upon and prescribed by the housing company for such cases with the approval of the commissioner." (L. 1951, ch. 532.)

It is this latter subdivision which is the subject of the plaintiffs' attack on constitutional grounds. The issue before me is not the wisdom of the legislation, but its legality. The court's province is to take the measure of the statute's validity, not to weigh its desirability. And at the outset, we must recall — and ever keep in mind — that a statute "can be declared unconstitutional only when it can be shown beyond reasonable doubt that it conflicts with the fundamental law, and that until every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible, the statute will be upheld." (*People ex rel. Henderson* v. *Board of Supervisors of Co. of Westchester*, 147 N. Y. 1, 16.)

The Constitution of the State of New York, as adopted in 1938, expressly empowered the Legislature, in sections 1 and 10 of article XVIII, to " provide in such manner, by such means and upon terms and conditions as it may prescribe for low rent housing for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto ", and " to make all laws which it shall deem necessary and proper for carrying into execution the foregoing powers ", even to the point of directing that this " 'article shall be construed as extending powers which otherwise might be limited by other articles of this constitution and shall not be construed as imposing additional limitations ". Moreover, there rests upon the Legislature the duty and the power to enact such necessary and appropriate legislation as will protect the health, safety and general welfare of the public; and, as the Court of Appeals stated so clearly in upholding the constitutionality of the earlier rent laws, " the state may establish regulations reasonably necessary to secure the

general welfare of the community by the exercise of its police power although the rights of private property are thereby curtailed and freedom of contract is abridged (citing cases). The legislative or police power is a dynamic agency, vague and undefined in its scope, which takes private property or limits its use when great public needs require, uncontrolled by the constitutional requirement of due process. Either the rights of property and contract must when necessary yield to the public convenience, advantage and welfare, or it must be found that the state has surrendered one of the attributes of sovereignity for which governments are founded and made itself powerless to secure to its citizens the blessings of freedom and to promote the general welfare '' (*People ex rel. Durham Realty Corp.* v. *La Fetra*, 230 N. Y. 429, 442–443).

The right, under normal circumstances, to fix the charge which is to be paid by one for the occupancy of another's property — that is, the power to establish rents — is in the owner of the property, and is a matter for his sole determination, unless, of course, there exists some statutory or contractual limitation. There is obviously nothing contractual here which prohibits the landlord's action, for there is no existing lease or agreement. By reason of the statutes and of the tenancies pursuant thereto, these plaintiffs have acquired certain rights of occupancy, but these rights are and must be limited by the statutes under which possession was obtained in the first instance, and under which, as amended from time to time, they continue in occupancy.

While limited-dividend, tax-exempt, low-rent housing projects were excluded from the control established by the State Residential Rent Law to apply to ordinary residential dwellings (L. 1946, ch. 274, § 2, subd. 2, par. [e], as amd.) the Legislature was empowered to establish, and it was justified in providing for, another statutory scheme whereby protection might be afforded under the existing emergency to landlord and tenant in developments constructed under the aegis of the State Housing Law. Undoubtedly as a result of current housing problems — both as to shortages and rents — applicable as well to these residential projects as to other dwellings, the Legislature in 1951, made an exception to its prior policy of restricting tenancies in such developments to those with prescribed income limitations. As amended, the statute authorizes the tenant in certain contingencies to remain as a tenant, even though by reason of an increase in income he had become disqualified to continue as such. Thus, the statute now provides that if the tenant cannot secure other safe and

sanitary housing accommodations, or if by reason of other facts the eviction of the tenant would result in undue hardship, the housing company might permit the tenant to continue his occupancy of the accommodations notwithstanding an excess income.

By its 1951 amendment, the Legislature also provided for increased rentals commensurate with increased tenant incomes. Its primary intention was to effectuate and carry out the policy and purpose of the State Constitution and the Public Housing Law — in the light of the present housing emergency — to provide proper dwelling accommodations for persons of low income, and at the same time to prevent the hardship of eviction from affecting residents of such projects whose income had risen above the prescribed limits. As properly read and understood, therefore, the section confers a benefit upon present tenants, rather than, as the plaintiffs contend, deprives them of property in violation of the Constitution.

Let me go further, and point out the resultant effects of this legislation — all of which may have been (and I must assume were) anticipated by the Legislature: As these were and are intended to be low-rent housing projects for low-income tenants, occupants having excess incomes should be required to surrender possession in order to continue the availability of these accommodations for low-income tenants; if excess-income tenants do not vacate, they should be required to compensate therefor by way of rent increases; the provision for such rent increases is fair, since they are graduated in proportion to income increases; moreover, this will encourage higher-income residents to remove from the premises — and thereby these projects will be maintained, as they should be, as low-rent residences for low-income tenants. And in the event the over-income tenant does pay the increased charge, such added receipts by the housing company will aid in providing prospective funds for the payment of taxes when the statutory exemption expires, it will facilitate the payment to investors of the permitted limited but cumulated dividends and interest, it will encourage the maintenance of the dwelling in good condition and it will gradually place these real estate developments on some kind of economic par with completely private residential apartment houses. For these and perhaps other reasons, the over-income tenants in this type of housing project are required by this legislation to pay increased rentals commensurate with ability to pay. I cannot say that, in so providing, the lawmakers sinned against the Constitutions —

Federal or State. There can in my view be no question of the power of the Legislature to set up a formula of a rent-income ratio for the fixation of maximum rents on low-rent projects built and maintained by limited-dividend corporations, and the formula here adopted is not in any sense unreasonable or violative of any basic constitutional rights.

The plaintiffs argue further that the delegation of authority as provided in clause (3) of paragraph (a) of subdivision 3 of section 182 of the Public Housing Law is unconstitutional. The applicable principles are plain. The Legislature " does not abdicate its functions when it describes what job must be done, who must do it, and what is the scope of his authority. In our complex economy that indeed is frequently the only way in which the legislative process can go forward " (*Bowles* v. *Willingham,* 321 U. S. 503, 515; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126; *Woods* v. *Miller Co.,* 333 U. S. 138). Where " standards are provided which, though stated in general terms, are capable of a reasonable application and are sufficient to limit and define the board's discretionary powers," the delegation of such powers to the administrative official by the Legislature is lawful (*Aloe* v. *Dassler,* 278 App. Div. 975, affd. 303 N. Y. 878). The Constitution " does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct * * * These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework." (*Yakus* v. *United States,* 321 U. S. 414, 424-425.)

The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring discretion in its execution, to be exercised under and in pursuance of that law. The first

cannot be done; to the latter no valid objection can be made. A Legislature may — and often must — delegate to an executive officer the power to determine facts and conditions upon which the operation of a statute depends. The delegation of the power here relates to the execution of the law, not to its creation. The statute here has prescribed a standard or guide by which the action of the officer is to be governed (*People* v. *Brooklyn Garden Apts.*, 283 N. Y. 373). Nor can the delegation of authority here reasonably be said to be vague, indefinite and meaningless. The Legislature itself has declared and defined the manner in and the extent to which the rents of tenants, whose income exceed the statutory ratio, may and shall be increased. The function of giving effect to the legislative pronouncement was necessarily committed to an administrative agent, in this case the Commssioner of Housing. Persons and families of low income, and low-rent housing, have been defined by the Legislature as precisely as practicable in subdivisions 18 and 23 of section 3 of the Public Housing Law. In clause (1) of paragraph (a) of subdivison 3 of section 182, the Legislature provides for such precise items as heat, light, fuel, number of dependents in tenant's family, etc. To empower the housing company to increase rentals in proportion to the tenant's ability to pay more, with the approval of the commissioner, was a necessary and practical expedient and cannot reasonably be construed as an unconstitutional delegation of legislative functions (*Yakus* v. *United States, supra*; *Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 281 N. Y. 187; *Matter of Vil. of Saratoga Springs* v. *Saratoga Gas, Elec. Light & Power Co.*, 191 N. Y. 123; *Davidson* v. *City of Elmira*, 180 Misc. 1052, 1057, affd. 267 App. Div. 797, motion for leave to appeal to the Court of Appeals denied 267 App. Div. 926).

Nor is there here an unconstitutional delegation or unlawful exercise of a judicial function. That there are (as there should be) factual bases, consideration, deliberation and determination preceding the commissioner's promulgation of the challenged schedule, does not mean that there is impermissible exercise of a judicial duty. (*Matter of Atkins* v. *Stichman*, 193 Misc. 986, affd. 274 App. Div. 926, motion for leave to appeal to the Court of Appeals or for reargument denied 274 App. Div. 1056; *Matter of Mouakad* v. *Ross*, 274 App. Div. 74.) The commissioner was deemed by the Legislature to be fully aware of the economic conditions obtaining today, particularly with reference to housing accommodations at the low-income level. He was legislatively assumed to know costs of living and minimum

fair rental values for comparable housing. In leaving the determination to the commissioner — on the basis of the statutory standards — the Legislature exercised a normal and usual prerogative and his action was not the assumption of forbidden judicial power.

Nor is there any merit to the contention that the plaintiffs were, in violation of constitutional protection, deprived of property without due process of law because no hearing was had on the question of the rent increase. The requirement that the commissioner approve such increase is a limitation on the housing company, which might, unless prohibited by the Legislature, fix the amount of the rent increase without reference to the tenants' ability to pay. "The purpose and intent of the underlying legislation was to clothe the respondent commissioner with the power to protect tenants and prevent their exploitation" (*Matter of Atkins* v. *Stichman, supra,* p. 989). The formulas for rent increases as promulgated by the commissioner are practical and a fair compliance with the spirit and letter of the statute. The precise increase of the rent to be charged a particular tenant whose income has increased, in proportion to his ability to pay more as provided in the schedule, has been reduced to a ministerial function. There is no legal necessity for a continuing and repeated computation and fixation of individual rentals. The practice here adopted is common. It is inconceivable that the Legislature intended that every rent increase for every tenant in every public housing project would require a hearing. This would impose an intolerable burden on the commissioner. (*Gelfand* v. *New York City Housing Authority,* N. Y. L. J., Jan. 30, 1952, p. 406, col. 7.)

Let me proceed to the final point urged by the plaintiffs. The State Housing Law of 1926 (as the first legislation of the type) makes no reference, of course, to the times of project construction or tenant occupancy — as all limited-dividend housing companies and accommodations provided for in this initial statutory plan would necessarily look to the future. The Public Housing Law which was enacted in 1939 was substantially the same as the former State Housing Law, but there were some changes. Subdivision 3 of section 182 of the 1939 statute (enacted after completion of the projects here involved, but before the plaintiffs' occupancy of their respective apartments), provided that the dwellings in a housing company project "hereafter constructed" shall be available for persons of restricted annual income as there defined. And in 1949 — after construction of both of the instant projects and after

occupancy by both plaintiffs — this section was amended (L. 1949, ch. 616) so as to make housing developments "heretofore and hereafter constructed" available for tenants whose incomes were not in excess of the maximum income prescribed for the respective accommodations. On the basis of these statutory amendments, the plaintiffs argue that the 1939 restrictions do not apply to them because the projects in which they reside were constructed prior to 1939; and the plaintiffs further contend that the 1949 restrictions — although in terms applicable to projects theretofore constructed — do not apply to the plaintiffs because they impose restrictions on continued occupancy by the plaintiffs of their apartments which restrictions were not present when they became tenants. I think the plaintiffs ignore the background of the legislation and misread the intent of the Legislature.

The first rule as to rental-income ratio (regulation 31 of 1936, heretofore quoted) made no distinction as to those limited-dividend housing projects, erected under the authority of the State Housing Law of 1926, which were constructed prior or subsequent to the promulgation of the rule; nor was any distinction made as to those tenants theretofore or thereafter admitted to occupancy. The Public Housing Law of 1939 continued in the Superintendent of Housing (the successor to the old State Board of Housing and the predecessor to the present State Housing Commissioner) the power to promulgate rules and regulations (§ 19); but rule 31 of the old State Board of Housing was not disturbed by the Superintendent of Housing or by the Housing Commissioner. Thus — unless the statute itself effectuated a change — accommodations in housing projects (whether constructed before or after the enactment of the Public Housing Law, or any of its present amendments) are available for the classified tenants (whether they commenced occupancy either before or after the enactment of the statute or amendment). And on the issue as to whether or not there was a statutory change, I am of the view that, because the 1939 statute in terms referred to projects "hereafter constructed", and the 1949 statute to projects "heretofore and hereafter constructed", that does not necessarily mean that the earlier regulation — making no distinction between old and new housing accommodations and old and new tenancies — was repealed. There was clearly no express nullification, and repeal by implication is not favored by the law. (See *Matter of Tiffany,* 179 N. Y. 455.)

Let us suppose that two limited-dividend companies of the same type have the same kind of housing accommodations in adjacent areas — was it the Legislature's intent to have different rules apply as to rental-income ratios because one project was completed in one year and another in a different year? Let us suppose that two tenants have precisely similar accommodations in the same limited-dividend housing project — was it the legislative intent to have different rules apply as to rental-income ratios because one tenant commenced his occupancy at a different time than the other tenant? I think the questions answer themselves. I believe that uniformity as to these matters was desired by the lawmakers, as a matter of general policy and as a matter of individual fairness. At least, before I would undertake to say that uniformity was not intended, the Legislature would have to express that view with unmistakable clarity.

It is not reasonable to suppose that the Legislature in 1939 intended by implication to allow all persons — regardless of income — to occupy apartments in projects theretofore constructed, when those very projects were based upon limited dividends to investors and were granted tax exemption by virtue of the public policy behind the enactment of a low-rent housing law for the specific benefit of only those prospective occupants who have low incomes. Nor did the 1949 amendment, which in express statutory language made the Public Housing Law applicable as well to housing projects theretofore constructed, thereby indicate a legislative intent to change an old objective or create a new one. The intention to me is quite patent — to make the low income-rental ratio provisions theretofore in use applicable generally by precise legislative enactment, rather than by statutory implication or regulatory procedure.

I conclude that clause (3) of paragraph (a) of subdivision 3 of section 182 of the Public Housing Law, under which an increased rent may be charged, is not unconstitutional; that the amendment is applicable to the instant limited-dividend housing developments, and to the present plaintiffs; that the schedule promulgated by the commissioner is not illegal or arbitrary; and that the fixation of rents proportionate to the tenant's ability to pay is not unlawful. The motion of the defendant commissioner and the cross motion of the defendant Brooklyn for judgment on the pleadings are granted. The cross motion of the defendant Knickerbocker, insofar as it seeks

judgment on the pleadings under section 476 of the Civil Practice Act and rule 112 of the Rules of Civil Practice, is granted; I see no need to pass upon the other aspects of the motion of the defendant Knickerbocker. The cross motion of the plaintiffs is denied. Settle judgment accordingly.